# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL BALDONADO,<br><br>    Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | Case No. 2:06-cv-07266-JHN-RZx<br><br>**POSTTRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Judge: Hon. Jacqueline H. Nguyen |

## INTRODUCTION

On June 7–9, 2011, the Court held a bench trial on Plaintiff Paul Baldonado's claim for medical malpractice against Defendant the United States of America. Having reviewed the testimony and exhibits presented at trial, the Court now makes the following findings of fact and conclusions of law.[1]

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over Plaintiff's claim pursuant to

---

[1] To the extent any findings of fact may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent any conclusions as stated may be deemed findings of fact, they shall also be considered findings.

28 U.S.C. § 1346(b)(1).

2. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1402(b).

## **FINDINGS OF FACT**

1. Defendant is sued in this matter for medical malpractice based on the medical care Plaintiff received from the Veterans Administration Medical Center—Long Beach ("VAMCLB").

2. Plaintiff was born in the Philippines, enlisted in the United States Navy in 1967, and served until 1987.

3. During his service, he was diagnosed with bipolar affective disorder and was prescribed various medications for this condition.

4. Following his discharge from the Navy in 1987, he received medical treatment, including for bipolar disorder, at the VAMCLB.

5. Among his treating physicians was psychiatrist James N. Nelson, M.D., who had also treated Baldonado during his Navy service.

6. Throughout the course of his treatment of Baldonado, Dr. Nelson was deemed to be a federal employee acting within the course and scope of his employment.

7. In 1993, Baldonado was diagnosed with hepatitis B, a viral infection that causes damage to the liver.

8. He was treated with a course of interferon therapy in 1994, but liver function tests thereafter continued to show elevated levels of liver enzymes as well as other results outside normal limits.

9. During the mid-1990s, Baldonado began to experience side effects from lithium, the primary medication used to treat his bipolar disorder, which he had taken for many years.

10. The side effects from Baldonado's lithium use included kidney damage and hand tremors that rendered him unable to write.

11. As a result, in February to March 1996, Baldonado was admitted to the VAMCLB, where he was taken off lithium and placed on Depakote, another medication used to treat bipolar disorder.

12. According to Defendant's expert psychiatrist, Brian Paul Jacks, M.D., between 1996 and 1998, the time frame that Baldonado was taking Depakote in place of lithium, these were the only two FDA-approved medications for the treatment of bipolar disorder.

13. Depakote is recognized as carrying the risk of harm to the liver, and particularly of being capable of causing acute liver toxicity, usually within the first six months of administration.

14. The *Physicians' Desk Reference* ("PDR"), a reference on medications that physicians commonly rely on, contains a special warning stating that patients prescribed Depakote should be monitored closely for symptoms of liver toxicity. The PDR also notes that Depakote "should not be administered to patients with hepatic disease or significant hepatic dysfunction."

15. Both Dr. Nelson, Baldonado's treating physician, and Dr. Jacks, Defendant's psychiatric expert, credibly testified at trial that Depakote is not absolutely contraindicated in patients with preexisting liver disease.

16. After Baldonado was placed on Depakote, lab work was done periodically to monitor his liver function. For example, Dr. Jacks's expert report identified fifteen liver function tests performed on Baldonado between February 1996 and March 1998.

17. Some results showed an increased elevation in Baldonado's liver enzymes, while other results were in line with those from before Baldonado began taking Depakote.

18. In November 1997, Baldonado was hospitalized for treatment of liver dysfunction and other related symptoms including ascites and hepatic encephalopathy.

19. Throughout and after his hospitalization, he was continued on Depakote.

20. In January 1998, Baldonado consulted a private gastroenterologist, William

Snape, M.D., who, while aware that Baldonado was being administered Depakote, nonetheless identified Baldonado's history of hepatitis B and alcohol consumption as secondary causes of his progressive liver disease.

21. From February to March 1998, physicians at the VAMCLB tapered Baldonado off Depakote. Baldonado was prescribed Neurontin, a medication that does not have the same effect on the liver.

22. In July 1998, Baldonado underwent liver transplant surgery at the University of California, Los Angeles ("UCLA") hospital.

23. UCLA medical records attributed Baldonado's liver disease to hepatitis B and noted a history of alcohol use. Absent from UCLA medical records was any mention that Baldonado's psychiatric medications played a role in causing or aggravating Plaintiff's liver failure or in necessitating a liver transplant.

24. In compliance with the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2675 *et seq.*, Baldonado filed an administrative claim for medical malpractice against Dr. Nelson and unspecified others at the VAMCLB, claiming toxic drug poisoning.

25. After an adverse decision on his claim, he instituted this action on November 14, 2006.

26. Following the finding that Dr. Nelson had been acting within the course and scope of his duties as a federal employee, the United States was substituted as the sole defendant in this action on March 15, 2007.

## **CONCLUSIONS OF LAW**

1. The operative pleading, Plaintiff's First Amended Complaint, states a single cause of action against the United States for medical malpractice.

2. Baldonado argued at trial that his treatment by the VAMCLB, and in particular by Dr. Nelson, was negligent because he should not have been prescribed Depakote in light of his liver disease, and he should have been taken off that medication as soon as lab tests indicated that his liver function was declining.

1       3. In a claim under the FTCA, the United States is liable to the same extent as a private person under like circumstances and according to the law of the place where the conduct complained of occurred. *See* 28 U.S.C. § 1346(b)(1).

      4. Accordingly, California law governs Baldonado's medical malpractice claim.

      5. In California, "[t]he elements of a cause of action for medical malpractice are: (1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." *Johnson v. Superior Court*, 143 Cal. App. 4th 297, 305 (2006).

      6. A plaintiff must prove each of these elements by a preponderance of the evidence. *See id.*

      7. To meet the burden of proof on a claim of medical malpractice, a plaintiff must employ competent expert testimony. *Willard v. Hagemeister*, 121 Cal. App. 3d 406, 412 (1981).

      8. In performing professional services for a patient, a physician has the duty to "exercise that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances. *Alef v. Alta Bates Hosp.*, 5 Cal. App. 4th 208, 215 (1992).

      9. Untoward consequences that occur as a result of a physician's error in judgment will not render that physician negligent absent a failure to meet the applicable standard of care. *Wilson v. Ritto*, 105 Cal. App. 4th 361, 369 (2003) (quoting *Huffman v. Lindquist*, 37 Cal. 2d 465, 475 (1951).

      10. "The fact that another physician might have elected to treat the case differently or to use methods other than those employed by defendant does not of itself establish negligence." *Costa v. Regents of University of California*, 116 Cal. App. 2d 445, 458 (1953).

4

1  11. Under California Civil Code section 1714.8(a), a physician is not liable for a result or occurrence that was caused "by the natural course of a disease or condition, or was the natural or expected result of reasonable treatment rendered for the disease or condition."

12. Where more than one recognized procedure or approach to a medical problem exists and no single procedure is used by all reputable practitioners, a physician will not be found negligent for selecting—in the exercise of the physician's best judgment—a particular approved procedure or approach that later is determined to be unfavored. California Jury Instructions Civil, BAJI 6.03; *Polikoff v. United States*, 776 F. Supp. 1417, 1421 (S.D. Cal. 1991).

13. Baldonado did not prove by a preponderance of the evidence that the treatment by the VAMCLB staff, including Dr. Nelson, fell below the applicable standard of care.

14. The initial decision to prescribe Depakote in 1996 was within the applicable standard of care.

15. Although Plaintiff's psychiatric expert, William Vicary, J.D., M.D., testified at trial that no reasonable physician would have prescribed Depakote to Baldonado given his history of liver disease, his conclusion was undermined by the fact that four other medical experts with whom he had consulted all had stated that Depakote could be prescribed for patients with preexisting liver disease upon a weighing of the risks and benefits.

16. Moreover, both Dr. Vicary and Dr. Jacks testified that no FDA-approved alternative medications were available in 1996 for use in the treatment of bipolar disorder.

17. The Court concludes based on all the evidence presented that the decision to continue Baldonado on Depakote until he was tapered off the medication in 1998 was within the applicable standard of care.

18. The evidence at trial indicated that Baldonado's liver function was sufficiently monitored during the time frame that he was on Depakote.

19. There was no showing at trial that the lab tests done on Baldonado showed a clear pattern that his liver function had worsened significantly while he was taking Depakote such that a doctor's decision to continue its use constituted a breach of the standard of care.

20. In addition, Baldonado failed to sustain his burden of showing that Depakote caused his liver failure and the need for the resulting liver transplant.

21. Dr. Snape, Plaintiff's private gastroenterologist, whom Plaintiff designated as an expert and who recommended the liver transplant, attributed the transplant's necessity to hepatitis B and possible alcohol use but not to Depakote.

22. Dr. Vicary did not credibly explain the fluctuations in the lab results while Baldonado was taking Depakote. Those results show both very high numbers and very low numbers consistent with Baldonado's liver function prior to taking Depakote.

23. Baldonado did not establish all of the required elements of a claim of medical malpractice by a preponderance of the evidence.

## **CONCLUSION**

Based on its findings of fact and conclusions of law, the Court concludes that Plaintiff failed to prove his claim for medical malpractice. Accordingly, Defendant is entitled to have judgment entered in its favor.

Dated: July 25, 2011

_____
HONORABLE JACQUELINE H. NGUYEN
UNITED STATES DISTRICT COURT JUDGE